**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-CR-146 (RDM)** |
| | : | |
| **v.** | : | |
| | : | |
| **MATTHEW MONTALVO,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Matthew Montalvo to 36 months' probation including 45 days' intermittent confinement as a condition of probation, 60 hours of community service, and $500 in restitution.

## I.      Introduction

Defendant Matthew Montalvo, a 46-year-old real estate agent and mortgage broker, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on October 14, 2022 (ECF No. 31 at ¶ 6) reflects a sum of more than $2.7 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol is $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Montalvo pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of intermittent confinement as a condition of probation is appropriate in this case because Montalvo: (1) pushed his way past police officers to gain access to the Capitol building through the Rotunda Doors shortly after that entrance was breached; (2) joined the mob outside the entrance to the House Chamber; (3) was in close proximity to the Speaker's Lobby doors when Ashli Babbitt was shot as she tried to climb into the House hallway through a broken window; (4) remained inside the Capitol building for more than 25 minutes, despite feeling the effects of tear gas; (5) left the Capitol building only when armed officers arrived to clear the rioters after the shooting; and (6) has not to date, offered a genuine express of sincere remorse.

The Court must also consider that Montalvo's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Montalvo's crime support a sentence of 45 days' intermittent confinement as a condition of probation.

## II.  Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 31 (Statement of Offense), at ¶¶ 1-7.

### Defendant Montalvo's Role in the January 6, 2021 Attack on the Capitol

Montalvo traveled from his home in Florida to Washington, D.C. to attend the "Stop the Steal" rally. *See* ECF 31 at ¶ 8. As seen in Figure 1, Montalvo walked to the east side of the Capitol

grounds and entered the restricted area at approximately 2:00 PM, shortly after the police line on the Northeast side of the Capitol had collapsed.



*Figure 1*

Around the same time that Montalvo entered the restricted area, rioters pushed past barricades and forced the Capitol Police to fall back to form a new line on the Capitol steps in an effort to guard the Rotunda Doors.



*Figure 2*

Rioters eventually made it all the way up the steps to the Rotunda Doors. A group of U.S. Capitol Police officers, some carrying riot shields, attempted to disperse the crowd, but the crowd was too large to be moved. Members of the crowd, meanwhile, chanted "Stop the steal," "Whose house? Our house!" and "USA!"

Montalvo was part of this large crowd that had gathered outside the Rotunda Door as U.S. Capitol Police officers attempted to prevent rioters from entering the building. *See* Figure 3. At

3

this time, a reporter from a French news agency, Bangumi, was outside the doors, filming the commotion. *See* Exhibit 1. At the 5 second mark of the clip, Montalvo can be seen among the crowd as rioters around him yell "Let us in. Let us in."  *See* Exhibit 1.



*Figure 3*

The Rotunda Door was initially breached by rioters at 2:25 PM.  As seen in Figure 4, CCTV footage from inside the building shows that at 2:27 PM, a U.S. Capitol Police Officer was blocking the door in an effort to stop entry when he was pulled to the ground by a rioter.  As seen in Figure 5, less than twenty seconds after the officer was pulled to the floor, Montalvo pushed his way in through the doorway past a Capitol Police officer (circled in blue) and into the building. *See* ECF 31 at ¶ 10. *See also* Exhibit 2.



*Figure 4*



*Figure 5*

After entering through the Rotunda Door, Montalvo walked through the Capitol Rotunda (see Figure 6) and Statuary Hall (see Figure 7).

4

 

*Figure 6*                    *Figure 7*

Montalvo then joined a crowd that had gathered in front of a police line that had formed

near the entrance to the Chamber of the House of Representatives.  While standing in the crowd,

Montalvo used a water bottle to flush tear gas out of his eyes.  *See* ECF 31 at ¶ 11. At the 14 second

mark of Exhibit 3, Montalvo can be seen standing among the crowd gathered outside the House

Chamber.



*Figure 8*

At the one minute and eleven second mark of Exhibit 3, the crowd starts chanting "Break

it Down! Break it down!" in reference to the door leading to the House chamber.

As Montalvo stood outside the House Chamber between approximately 2:35 and 2:40 p.m.,

lawmakers began evacuating the Chamber. Those in the gallery sheltered in place. The following

two photos show the interior of the House Chamber during the riot; Figure 9 depicts the Gallery and Figure 10 depicts the ground floor of the Chamber.





*Figure 9[2]*                                                      *Figure 10[3]*

Having seen that the crowd around him wanted to break into the House Chamber, Montalvo could have turned around and exited. Instead, he opted to venture deeper into the Capitol. He joined other members of the mob who broke off and moved down a hallway toward the Speaker's Lobby, another potential path to the House Chamber. At the one minute and fifty-six second mark of Exhibit 3, Montalvo can be seen among the crowd moving down the hallway (*see* Figure 11) and recording on his phone (*see* Figure 12) as the rioters move towards the entrance of the Speaker's Lobby.  *See* ECF 31 at ¶ 12.  In this clip, Montalvo continues to proceed towards the Speaker's Lobby even after seeing another rioter attempt to kick open a door.

---

[2] Andrew Harnik, Associated Press, available at
https://www.npr.org/sections/pictureshow/2022/01/06/1070610129/photos-one-year-later-alook-back-on-the-jan-6-insurrection (last visited March 2, 2022).
[3] J. Scott Applewhite, Associated Press, *available at*
https://www.npr.org/sections/pictureshow/2022/01/06/1070610129/photos-one-year-later-alook-back-on-the-jan-6-insurrection.




*Figure 11*

*Figure 12*

Montalvo was among the crowd gathered in the hallway about twenty feet away from where Ashli Babbitt was shot as she attempted to enter the Speaker's Lobby.  Soon after, a Civil Disturbance Unit from the Metropolitan Police Department Officers arrived (*see* Figure 13) and forced the crowd, including Montalvo, out of the Capitol Building through the Upper House Door at 2:54 PM (see Figure 14).  *See also* Exhibit 4.




*Figure 13*

*Figure 14*

Montalvo was inside the Capitol building for approximately 27 minutes.  *See* ECF 31 at ¶ 13. He knew at the time he entered the Capitol that he did not have permission to enter the building and he paraded, demonstrated, or picketed inside the building.  *See* ECF 31 at ¶ 14.

*The Charges and Plea Agreement*

On April 15, 2022 the United States charged Montalvo by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1), (a)(2); and 40 U.S.C. §§ 5104(e)(2)(D), (e)(2)(G). On April 26, 2022, law enforcement officers arrested him at his home in Florida. On April 28, 2022, the United

7

States charged Montalvo by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1), (a)(2); and 40 U.S.C. §§ 5104(e)(2)(D), (e)(2)(G). On October 14, 2022 pursuant to a plea agreement, Montalvo pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104 (e)(2)(G). By plea agreement, Montalvo agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Montalvo now faces a sentencing on a single count of violating 40 U.S.C. § 5104 (e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. Montalvo must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 45 days' intermittent confinement as a condition of probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy."
*United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds
of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while
staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States
v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Montalvo's
participation in that attack to fashion a just sentence, this Court should consider various
aggravating and mitigating factors. Notably, for a misdemeanor defendant like Montalvo, the
absence of violent or destructive acts is not a mitigating factor. Had Montalvo engaged in such
conduct, he or she would have faced additional criminal charges.

One of the most important factors in Montalvo's case is the fact that he pushed his way
past police officers who were attempting to keep rioters from entering through the Rotunda Doors.
This was a critical breach point on January 6 and Montalvo was among the first wave of rioters to
stream into the building through this point of entry.

Once inside, the scenes Montalvo observed every step of the way showed his presence in
the Capitol was a violation of law, yet he persisted through until police armed with weapons and
in riot gear herded the rioters outside.

Accordingly, the nature and the circumstances of this offense establish the clear need for a
sentence of intermittent confinement as a condition of probation.

### B.  The History and Characteristics of Montalvo

As set forth in the draft PSR, Montalvo has no prior criminal convictions. ECF 34 at ¶ 22.
He does not appear to have any social media presence. Id. ¶ 32. Montalvo has been compliant with
the terms of his pretrial release. Id. ¶ 5.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The Government acknowledges that Montalvo accepted responsibility by entering into this plea agreement. On the other hand, Montalvo's actions on January 6 demonstrate the need for specific deterrence for this defendant. He was in close proximity to confrontations between rioters and law enforcement officers both outside the Rotunda Doors and in the area near the Speaker's Lobby, but none of these clashes deterred Montalvo who remained inside the building for more than 25 minutes and only left when an MPD Civil Disturbance Unit arrived to forcibly remove rioters. There is a clear need for specific deterrence in the form of intermittent confinement as a condition of probation.

**E.  The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Montalvo based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Montalvo has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants

[4] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

13

The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been

accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Scavo*, 1:21-CR-254 (RCL), the defendant, like Montalvo, entered the Capitol through the Rotunda Doors shortly after the initial breach, where multiple assaults on law enforcement occurred. Also, like Montalvo, Scavo had no prior convictions at the time of sentencing. Scavo pled guilty to violating 40 U.S.C. § 5104(e)(2)(G) and he was sentenced to two months incarceration.

In *United States v. Mish,* 21-cr-00112 (CJN), the defendant, like Montalvo, was in the proximity of the Speaker's Lobby when Ashli Babbitt was shot. Mish pled guilty to violating 40 U.S.C. § 5104(e)(2)(G), and he was sentenced him to 30 days' incarceration. Mish had a lengthy criminal history—a factor not present in Montalvo's case. However, unlike Montalvo, Mish did not force his way into the Capitol past law enforcement. In that respect, Montalvo's conduct is more blameworthy.

In *United States v. Suleski,* 21-cr-00376 (RDM), the defendant observed rioters confronting the police blocking the Rotunda Doors on the east front of the Capitol, keeping the outside rioters from entering, and he observed police officers using chemical agents to try and keep rioters at bay. Suleski also stole papers from outside an office—a factor that is not present here. However, Montalvo spent nearly twice as much time inside the Capitol as Suleski and Montalvo ventured all the way to the Speaker's Lobby— which in the government's view makes Suleski's behavior only slightly more serious than Montalvo's conduct.   Suleski pled guilty to violating 18 U.S.C. § 1752(a)(1) and 18 U.S.C. § 641 and this Court sentenced him to 60 days' incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.    This Court is authorized to and should impose a term of incarceration as a condition of probation pursuant to 18 U.S.C. § 3563(b)(10).

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."   18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant remain in the custody of the Bureau of Prisons during nights, weekends or other

intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[5]

Section 3563(b)(10) authorizes a sentencing court to impose one or more intervals of imprisonment as a condition of probation.  18 U.S.C. § 3653(b)(10).  Section 3563(b)(10) authorizes sentencing courts to impose up to a year (or the authorized statutory maximum) of imprisonment, which the defendant must serve during the first year of probation.  *Id.*  Thus, for a violation of 40 U.S.C. § 5104(e)(2)(G), Section 3563(b)(10) facially permits a sentencing court to require the defendant to serve up to six months in prison as a condition of probation.  *See* 40 U.S.C. § 5109; 18 U.S.C. § 3563(b)(10).  Any imprisonment term imposed as a condition of probation must be served during "nights, weekends or other intervals of time." § 3563(b)(10).

Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-

---

[5] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation); *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999) ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

Typically known as "intermittent confinement," a sentencing court may impose multiple intervals of imprisonment under Section 3563(b)(10). *See Anderson*, 787 F. Supp. at 539. Section 3563(b)(10) thus authorizes this Court to impose more than one imprisonment interval, where each such interval is no more than 14 days. *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30-day imprisonment sentence (ten three-day intervals) and three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42-day imprisonment sentence (three 14-day intervals) and three years of probation); *United States v. Reed*, 21-cr-204 (BAH), ECF No. 177 (D.D.C. Apr. 14, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH), ECF No. 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Howell*, 21-cr-217 (TFH), ECF No. 41 (D.D.C. Mar. 8, 2022) (imposing 60-day imprisonment sentence (six 10-day intervals) and three years of probation); *United States v. Schornak*, 21-cr-278 (BAH), ECF No. 71 (D.D.C. Feb. 18, 2022) (imposing 28-day imprisonment sentence (two 14-day intervals) and three years of probation). Imposing an intermittent confinement sentence with 45 days of imprisonment as a condition of probation is appropriate in this case.

To be sure, earlier in the investigation of the January 6 attack on the Capitol, the government refrained from recommending intermittent confinement sentences given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. At this point, however, multiple jury trials have successfully occurred, *see* Standing Order No. 22-64 (BAH), at 3 (D.D.C. Nov. 9, 2022) (noting that the Court has "forg[ed] ahead" and eas[ed] the backlog" of criminal cases since the Omicron surge began to abate in February 2022), and general COVID trends appear to show a decrease in cases.[6]

### VI.    A sentence imposed for a petty offense may include both imprisonment and probation.

The government's recommended sentence of 45 days' intermittent confinement as a condition of probation is also permissible under 18 U.S.C. § 3561(a)(3). As Judge Lamberth observed, Section 3561(a)(3) "permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses." *Little*, 590 F.Supp.3d at 351; *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Because the government has briefed a sentencing court's authority to impose a split sentence for a defendant convicted of a single petty offense in this Court and the D.C. Circuit, those arguments are not elaborated further here.[7]

---

[6] *See* Centers for Disease Control and Prevention, COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last viewed Nov. 21, 2022).

[7] The defendant's appeal of the split sentence imposed in *Little* is pending. The D.C. Circuit heard oral argument on November 2, 2022.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 45 days' intermittent confinement as a condition of probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

> Respectfully submitted,
>
> MATTHEW M. GRAVES
> United States Attorney
> D.C. Bar No. 481052
>
> By:    s/ *Jason M. Crawford*
> JASON M. CRAWFORD
> Trial Attorney
> DC Bar No. 1015493